**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING** | ) | **CASE NO.1:04CV16** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **ROSS ERSKINE, ET AL.,** | ) | **MEMORANDUM AND OPINION** |
| | ) | |
| **Defendants.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Plaintiff Commodity Futures Trading Commission's ("CFTC")(ECF Dkt#78) and Defendants' Ross Erskine and Goros, LLC Motions for Summary Judgment(ECF Dkt # 61). For the following reasons, the Court denies Plaintiff's Motion for Summary Judgment and grants, in part, Defendants' Motion for Summary Judgment.

Commodity Futures Trading Commission's Complaint alleges Defendants' Ross Erskine and Goros, LLC misrepresented facts and omitted pertinent information when soliciting customers to trade in commodity futures in violation of the Commodity Exchange Act ("CEA"). This case presents three issues:

1) Did Defendants engage in fraudulent acts and unauthorized trading?

1

2) Does the CFTC have jurisdiction over foreign currency futures?

3) Should this Court grant injunctive relief?

**Plaintiff Alleges**

Plaintiff alleges Ross Erskine ("Erskine") is the sole principal of Goros, LLC ("Goros"). Goros sales representatives solicited customers to open managed accounts, whereby clients did not make their own trading decisions but authorized Goros to trade on their behalf by means of power of attorney authorizations.  Plaintiff alleges Erskine made all the trading decisions without any experience in trading currency and failed to disclose this fact to customers.  No Goros customer made a profit, even though Goros sales representatives promised returns of 100 to 400 percent in as little as one month.  Erskine continued to make trades even after customers asked to have their accounts closed.

From August of 2001 through July of 2002, Goros and Erskine solicited the public to engage in transactions involving foreign currency.  Goros was licensed with the CFTC as a broker and later as a commodity trading advisor. Plaintiff alleges Erskine solicited customers under the alias of Brian Turner and used telemarketers to make cold calls to customers.  Goros clients were generally unsophisticated in commodity trading.  Twenty customer accounts were traded through Gain Capital, Inc. and FX Solutions, which were futures commission merchants (FCM's).  FCM's are individuals, associations, partnerships, corporations or trusts engaged in soliciting or in accepting orders for the sale or purchase of commodity for future delivery on or subject to the rules of any contract market.  An introducing broker (IB) is any person engaged in soliciting or accepting orders for the purchase or sale of a commodity for future delivery.  An associated person (AP) is any person associated with an FCM, IB or commodity trading advisor

2

(CTA). Plaintiff contends Goros was a registered IB and Erskine was an AP of Goros during the relevant time period. Gain Capital was a registered futures commission merchant. FX Solutions was not a registered futures commission merchant at the time Goros' customers traded with it.

A total of $472,822.38 in customer funds were deposited into trading accounts. Goros received $366,291.48 in commissions. Customers signed a written customer agreement and a power of attorney authorizing Goros to trade on their behalf. Customers then signed agreements with the FCM's and deposited funds with the FCMs. Erskine and Goros would then direct the activity of the customer accounts held by the FCMs. Plaintiff alleges Erskine made all trades for Goros clients. Erskine was the sole principal and owner of Goros from August 2001 to July 2002, and supervised all Goros salespersons. He instructed them on what to say, he hired the salespersons and conducted sales meetings. Erskine was sole signatory on documents submitted to the National Futures Association and on Goros' bank accounts.

CFTC alleges Defendants engaged in solicitation fraud by running a classic "boiler room" operation. Salespeople with no experience in trading were hired to cold call customers. If someone expressed an interest they were handed over to Erskine or a more seasoned sales rep for the close. Sales reps promised high returns with virtually no risk of loss. Customers were told stop loss orders would be placed to protect their investments, therefore, there was very little risk in trading. Plaintiff contends any warnings given with account-opening documents were vitiated by the representations of Erskine. According to Commission Regulation Section 1.55(b)(3), 17 C.F.R. §1.55(b)(3)(2005), Defendants were required to warn customers that placing stop loss orders or stop limit orders will not necessarily limit losses.

Defendants allegedly continued to trade client accounts after receiving oral instructions

from clients to close their accounts and refund balances. Erskine continued to trade on their accounts without their consent. At least one client instructed Defendants to close his account at $35,000. They continued to trade it down to $1,000 before closing the account. Some clients were told they would not be charged commissions if their accounts were not profitable. However, all were charged commissions. CFTC alleges the commission charge was found in account opening documents but was not disclosed in trading statements.

### **Defendants' Response**

Defendants contend the transactions involved were "spot" transactions, not transactions for currency futures; and therefore, the CFTC does not have jurisdiction over the transactions alleged in the Complaint. Further elucidation of Defendants' response is contained in the Court's analysis of CFTC's jurisdiction below.

### **The CFTC's Jurisdiction**

As a threshold issue, the Court must determine if the CFTC has jurisdiction to enforce the transactions involved in its Complaint. Pursuant to 7 U.S.C. § 2(a)(1)(A) the CFTC has jurisdiction to regulate "transactions involving contracts of sale of a commodity for future delivery." Plaintiff alleges 7 U.S.C. §2(c)(2)(B) (2002) expressly grants the CFTC jurisdiction over the transactions alleged in the Complaint. This section states in pertinent part:

2) Commission jurisdiction

> (B) Agreements, contracts, and transactions in retail foreign currency
>
> This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that--
>
> Is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option (other than an option executed or traded on a national securities exchange), registered pursuant to section 6(a) of the Securities Exchange Act of 1934...

4

Prior to 2000, the CFTC had no jurisdiction over off-exchange transactions in foreign currency.  In 2000, Congress enacted the Commodity Futures Modernization Act, giving jurisdiction to the CFTC over foreign exchange transactions involving contract sales of foreign currency for future delivery.

Defendants contend the transactions involved do not fall under the CFTC's jurisdiction, as they were "spot" transactions and not futures contracts.  The Sixth Circuit has defined a futures contract as "contracts for sale of a commodity for future delivery." *The Anderson's Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 318 ( 6th Cir. 1998). A spot transaction is a "transaction for the immediate sale and delivery of a commodity." *Id.*

Plaintiff would have the Court rely on *Anderson's* as controlling law for the proposition that, in determining whether a contract is a spot transaction or a futures contract, a court should focus on whether, "there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id.* Defendants contend the Seventh Circuit's decision in *CFTC v. Zelener,* 373 F.3d 861 (7th Cir. 2004) should be relied on, as its facts and issues are nearly identical to the facts and issues in this case.

The Court finds the *Zelener* decision to be of more practical guidance since its facts and issues mirror the claims by Plaintiff in the case before this Court.  Furthermore, the *Anderson's* case preceded the Modernization Act by nearly two years; dealt with grain and not foreign currency; and involved "cash forward contracts," not spot transactions.  Even assuming *Anderson's* has more relevant application, this Court finds that *Anderson's* is not inconsistent with *Zelener,* nor does it compel a different conclusion. In addition, the Court recognizes the

5

Seventh Circuit's expertise in analyzing transactions in commodities, as its' jurisdiction encompasses the Chicago Mercantile Exchange, the world's largest financial exchange.

There is no dispute that the contracts entered into by customers with the FCM's Gain and FX purported to be spot transactions on their face. CFTC contends that whatever Defendants and the FCM's called their transactions is irrelevant, as they were transactions in futures contracts in practice. Defendant contends the FCMs offered prices on foreign currency to customers. The FX and Gain transactions were meant to be spot transactions as reflected in their Account Opening Agreements. The FX and Gain documents demonstrate customers could make a request and FX and Gain would deliver the foreign currency.

According to Plaintiff, the transactions at issue were futures contracts because the customers had no intention of accepting delivery of the foreign currency and, in fact, never took delivery of the foreign currency. This is corroborated by the declarations of the customers provided in support of Plaintiff's Motion. The customers each aver that they had no intention of taking delivery of the commodity and each refers to the transactions as "futures contracts." Plaintiff contends the transactions involved were speculative in nature, were bought on margin and therefore, the customers never had ownership of the foreign currency. Plaintiff also contends the ability to offset positions evidences a futures contract. Courts look to whether the terms of the contracts are standardized and are traded in market situations. If so, the ability to offset exists. *Chicago Mercantile Exchange v. SEC,* 883 F.2d 537, 542 (7th Cir. 1989). Also, if there is a promise to offset, even if the terms of the contracts are not standardized, the ability to offset exists. *Zelener,* 373 F.3d at 868. Plaintiff argues the language of the Gain and FX opening documents evidences the ability to offset by offering stop/loss orders, and describing

6

customers initial transactions as "opening" transactions.

Plaintiff further contends the transactions were standardized contracts in terms of the size of the contracts.  Plaintiff contends standardization applies to the terms of the contracts, not the terms of the transaction.

Defendants point out that nearly identical contracts were found in the *Zelener* case to be spot transactions outside the jurisdiction of the CFTC.  This Court agrees with that observation and Defendants' arguments why the same result should ensue here.

The Court finds the plain language of the opening documents signed by all customers prior to trading in foreign currency through Goros and Erskine states:

**Section 9 of the Gain Capital Customer Agreement**
"in cases where transactions are for physical delivery, instructions on the settlement of Open positions must be given to GAIN Capital at least (2) business days prior to Value Date.  In the absence of instructions from Customer directing Gain Capital to deliver, offset or rollover Open positions, Gain Capital is authorized, in Gain Capital's sole discretion, to deliver, roll over or offset....Delivery of foreign currency shall be made to the bank specified by purchaser in a major city in the country in which the Foreign Currency is the legal tender.  Unless otherwise agreed by Gain Capital and Customer in writing, the Foreign Currency shall be deliverable by wire transfer."

The FX Solutions contract expressly states:

"Trader acknowledges that the purchase or sale of a Currency always anticipates the accepting and making of delivery." In addition, the FX contract contains similar language to the Gain Capital Agreement on instructions for physical delivery and the discretionary authority of FX to deliver to customer the currency in the absence of instructions from customer.

Defendants outline the following similarities between the claims in this case and the claims in *Zelener*: (1) each Goros client executed a customer agreement with Gain or FX (CFTC has apparently abandoned its claims with respect to the FCM Vision Limited Partnership

7

transactions); (2) both Gain and FX opening documents characterize the transactions as spot transactions; (3) both Gain and FX documents state all transactions will be settled within 48 hours; (4) absent instructions from customers to take delivery, positions were routinely "rolled over" or offset (selling a previously bought currency or buying a previously sold currency); and (5) no guaranteed right to offset exists in the Gain or FX agreements.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is not material unless it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). An opponent of a motion for summary judgment may not rely on the mere allegations of the complaint, but must set forth specific facts showing a genuine issue for trial. *Id.* When no reasonable jury could return a verdict for the non-moving party, no genuine issue exists for trial. *Id.* However, in evaluating a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the non-moving party. *Gen. Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1097-98 (6th Cir. 1994).

## ANALYSIS

This Court has not found, nor do the parties direct the Court to, a Sixth Circuit decision regarding commodity trading in futures contracts for foreign currency similar to the issues at bar. Fortunately, the exact issue has been addressed in the Seventh Circuit in *Zelener*, and the Court finds its holding persuasive. An initial review finds the customer agreement language in the

*Zelener* case nearly identical to the Gain and FX agreements in this case.  In fact, the CFTC's arguments in *Zelener* are nearly identical to the arguments the CFTC makes in this case, though supported here with a greater abundance of evidentiary materials and additional analysis of the nature of the transactions at issue.

Plaintiff's primary argument focuses on the speculative nature of the transactions.  No customer anticipated or took actual delivery of the commodity.  Plaintiff argues that settling contracts by offset in U.S. dollars evidences the speculative nature of the transactions and demonstrates the clear intent not to take delivery.  As spot transactions are for immediate delivery (the evidence presented shows the industry standard is forty-eight hours), the speculative nature of the transactions demonstrates futures contracts.  However, "transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented." *Salomon Forex, Inc. v. Tauber,* 8 F.3d at 970 (4th Cir. 1993).

Customers were permitted to buy on margin, allowing customers to maintain equity in their account sufficient to serve as collateral to ensure performance and trade foreign currency in amounts exceeding the funds in the customers account.  The margin trade requires a daily settlement in cash for all variations in price.  Any net loss in the customer's account requires the customer provide additional funding in the customer's account to maintain the adjusted margin.  Plaintiff contends buying on margin demonstrates the transactions were futures transactions, as the customer could not take delivery until substantially greater funds were deposited into their accounts to cover the actual cost of the commodity purchased.

In the underlying United States District Court decision in *CFTC v. Zelener,* No. 03

C4346, 2003 WL 22284295, *4 (N.D. Ill. Oct. 3, 2003), the Court found that the CEA "does not purport to cover all speculation in foreign currencies that is extended over a substantial period of time. It covers futures contracts." The Court looked to the contracts being purchased by customers in relation to the defining features of a futures contract, i.e. a fixed delivery date and a fixed price "at which the customer must liquidate the contract."*CFTC v. Frankwell Bullion Ltd.,* No. C-94-2166 DLJ, 1994 WL 449071 (N.D. Cal. Aug. 12, 1994). The *Zelener* Court found these features absent from the transactions. Similarly, this Court finds the transactions involved here do not demonstrate purchases of futures contracts but rather the trading of spot transactions, as the features of the *Zelener* transactions mirror the transactions in this case. As in *Zelener*, this Court does not find that rolling over or offsetting of spot transactions converts them to futures contracts. The evidence before the Court demonstrates that the contracts purchased were bought at a price determined by the market at the time of the purchase and were sold, not for some fixed price in the future, but at the market price at the time of the sale or offset. Likewise, the *Zelener* Court found the transactions before it, "were liquidated not on the basis of a value determined at the time of contracting, but at a market value determined at the time of sale." *Zelener* at *4. This salient point was critical in differentiating a futures contract from spot transactions. As the *Zelener* Court held, the CFTC's jurisdiction is limited to futures. "It does not cover the spot market, regardless of the motivation of the transactions." *Zelener,* at *5 citing *Bank Brussels Lambert, S.A., v. Intermetals Corp.,* 779 F. Supp.741, 750 (S.D. N.Y. 1991). Therefore, the Court finds that the intent to speculate does not abrogate the clear contract language anticipating possible delivery.

At the appellate level the Seventh Circuit analyzed the term "contract for future

10

delivery" contained in the CEA.  The Seventh Circuit determined the phrase "contract for future delivery" does not "refer to all contracts in which settlement lies ahead; then it would encompass most executory contracts." *Zelener,* 373 F.3d at 865.  The Court also found that where the right to offset lies with the FCM and not the customer, as is the case here, the spot transaction does not become a futures contract. Finally, the FCM in *Zelener* allowed customers to trade on margin and the Court did not find that margin accounts made the transactions futures transactions.

As to the standardization of the contracts, Plaintiff argues the customer could select from a list of standardized amounts ranging from 1000 unit contracts to 100,000 unit contracts.  This standardization evidences the fungibility of the contracts purchased and further evidences futures contracts.  However, as customers could keep positions open through rollovers, take delivery or sell back to the FCM the currency, the customers' transactions differed in price, amount and settlement date, unlike futures contracts where the contract must be liquidated at a fixed date determined at the time of the purchase.

The Seventh Circuit found the form of the contract, not the intent, should be definitive.

> "Nothing is worse than an approach that asks what the parties intended or that scrutinizes the percentage of contracts that led to delivery ex post.  What sense would it make–either business sense, or statutory-interpretation sense–to say that the same contract is either a future or not depending on whether the person obliged to deliver keeps his promise? That would leave people adrift and make it difficult, if not impossible, for dealers, (technically, futures commission merchants) to know their legal duties in advance." (*Zelener,* at 866).

Ultimately, this view comports with this Court's opinion that the form of the contract, and not the intent, should be determinative.  It is disingenuous for customers to allege an

11

intent to engage in futures transactions without taking delivery when the plain language of the agreements they signed expressly states the transactions are spot transactions and the parties may take delivery of the commodity.

Therefore, although Plaintiff has set forth evidence of fraud, it has failed to demonstrate the transactions involved were futures transactions. As the transactions involved were spot transactions, the CFTC has no jurisdiction over the transactions alleged in the Complaint and the Court grants Summary Judgment for Defendants on the limited issue of jurisdiction and denies Plaintiff's Motion for Summary Judgment. The Court makes no determination on the claims of fraud or requested remedies. The claims against Defendants are therefore, dismissed.

IT IS SO ORDERED.


April 17, 2006                                    /s/ Christopher A. Boyko

Date                                              CHRISTOPHER A. BOYKO
                                                  United States District Judge